IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>v.<br><br>**RICHARD KESSLER,**<br><br>Defendant | Case No. 1:21-cr-265-DHU |

### UNITED STATES' SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through its undersigned attorneys, respectfully submits this Sentencing Memorandum for the Court's consideration.

### I. Defendant's Offense of Conviction and Relevant Conduct

Defendant RICHARD KESSLER holds a bachelor's degree in business from the University of New Mexico in 1991, and he was a licensed General Securities Representative from approximately 2005 to 2018. At all times material to the charges in this case, defendant was self-employed as a financial advisor and investment broker doing business as Guardian Group Investments LLC (GGI). In that capacity, defendant earned commissions by managing retirement accounts for small businesses.

Those businesses included an oil and gas company in Farmington, New Mexico. Defendant occasionally made presentations to employees of that business regarding retirement planning and financial investments. He used those interactions—and the private conversations that followed—to convince several of that business's workers to take funds out of their established retirement accounts and entrust their retirement funds to him.

Defendant, who had been a licensed General Securities Representative since 2005, was aware of his duty to maintain investor's funds separately from his own. Indeed, defendant had been warned by New Mexico securities regulators not to keep client funds in GGI's business savings account. Nonetheless, defendant deposited investors' retirement funds into GGI's business savings account (ending in 2328) at Sandia Laboratory Federal Credit Union account (SLFCU). From there, defendant converted and expended those funds through transfers to personal Wells Fargo Bank (WFB) account, cashier's checks that he would use for personal expenses, and cash withdrawals. Defendant also used a portion of investors' retirement funds to make payments to earlier investors to replace funds that he had previously misappropriated.

During the span from 2013 to 2016, several investors entrusted defendant with retirement funds totaling more than $161,000. Defendant represented to those investors that he would place their retirement funds in qualified investment accounts. When defendant's scheme inevitably collapsed, four of those investors—C.K., F.G., V.C. and L.J.—were directly impacted. Three of them—F.G., V.C., and L.J.—lost almost all of the retirement funds that they had entrusted to defendant.

- <u>C.K.</u>: C.K. had a retirement account as a prior job and wanted to transfer it to his retirement account at the Farmington-based oil and gas company. Defendant offered to help him do that. In February of 2016, C.K. and defendant called OneAmerica Financial Partners, Inc. (OAFP), to liquidate C.K.'s qualified Investment Retirement Account. OAFP is an Indiana-based company, and the request was made via interstate phone call. Defendant assisted C.K. in making the distribution request, and he caused OAFP to mail the disbursement check to what was at the time defendant's residence. That check, in the sum of approximately $23,796, was deposited into GCI's SLFCU account on March 4,

2016. Over the next two weeks, defendant took a total of $23,000 out of that SLFCU account: on March 4, defendant withdrew $2,000 in cash deposited $2,000 into his personal WFB account the next day; on March 8, he withdrew $10,000 in cash and the same day deposited $10,000 in four deposits into his WFB account; on March 9, defendant withdrew $4,000 from the SLFCU account in cash and deposited the same amount in cash into the WFB account. Money from the WFB account was then used for everyday expenses and also to finance a trip to several Las Vegas, Nevada, casinos in mid-March 2016. On March 15, Defendant bought a $5,000 cashier's check using funds remaining in the SLFCU account, which was made payable to child support enforcement. On March 16 he bought another cashier's check in the sum of $2,000. There is a corresponding order of the New Mexico Second Judicial District Court noting evidence of payment of child support arrears.

- F.B.: Defendant repeated this scheme with F.B. Defendant helped F.B. make a distribution request to Oppenheimer Funds Services (OFS), where F.B. had an account. Defendant misled not only F.B. but also OFS, representing in an interstate fax (OFS is a New York-based company) that defendant had established a qualified IRA account with GGI on F.B.'s behalf. The disbursement of F.B.'s retirement funds was made in four checks totaling approximately $34,331, which were delivered to defendant's residential address. Those checks were deposited into CGI's SLFCU business savings account on April 29 and May 9, 2016. Defendant subsequently used the bulk of that money to purchase a truck: on May 12, 2016, defendant drew $20,000 from the SLFCU account to fund a cashier's check to That Car Place, an Albuquerque used-car dealership as partial payment for the purchase of a 2012 Toyota Tundra.

- <u>V.C.</u>: Defendant also helped himself to V.C.'s retirement savings under the guise of helping V.C. transfer his retirement savings to a new qualified retirement account. Defendant helped V.C. submit a request to withdraw funds from V.C.'s retirement account held by the Farmington-based oil and gas company. That disbursement check was mailed to V.C., who converted it to a cashier's check from his bank in the sum of $30,000. V.C. presented that check to defendant with the understanding that defendant was to deposit those funds into a qualified Individual Retirement Account. Defendant instead deposited V.C.' check into CGI's SLFCU account on August 2, 2016. Two days later, Defendant withdrew $13,270 in cash from the SLFCU account) and deposited that sum into his personal WFB account. Defendant subsequently expended funds the WFB account in to fund  another trip to Las Vegas, a trip along the California coast, rent payment, and child support. Additionally, on August 4, 2016, defendant made a wire transfer in the sum of $12,372.68 from the SLFCU account to another client, C.F., as partial repayment of approximately $38,000 that defendant misappropriated in 2013.

- <u>L.J.</u>:  Defendant put the retirement funds of L.J. to similar use. L.J. mailed a cashier's check in the sum of $20,000 to defendant's home address per defendant's instructions. L.J.'s money was to be placed in a qualified Individual Retirement Account.   However, defendant instead deposited L.J.'s retirement funds into CGI's SLFCU account on August 23, 2016. Three days later, defendant used L.J.'s money to restore a portion of the retirement funds that he had previously misappropriated from C.K.; on August 26th, defendant wired $25,296.30 from the SLFCU account to create a Roth IRA for C.K. at Allianz Life to replace much of the retirement fund that defendant had misappropriated from C.K. in March 2016.

In addition to defrauding investors and converting their retirement funds his personal purpose and to perpetuate his Ponzi scheme, defendant also failed to file federal tax returns or pay federal income tax for tax years 2014 through 2017.  During that time period, defendant earned commissions from legitimate investment management, as well as the illicit income from his frauds.  Defendant's income over these four years—legitimate and illegitimate—came to $446,925.  This resulted in a tax liability of $82,627.  Defendant knew he was required to pay taxes on his income from GGI, having done it from the company's inception in 2008 through 2011.  However, did not pay the taxes due on his income and simply chose not to file tax returns for 2014 through 2017.

Pursuant to a Plea Agreement [Doc. 42], on April 18, 2022, defendant pled guilty to an Information [Doc. 39] charging: one count [Count 1] of Mail Fraud in violation of 18 U.S.C. § 1341; one count [Count 2] of Wire Fraud in violation of 18 U.S.C. § 1343; and four counts [Counts 3, 4, 5 and 6] of Failing to File Tax Returns in violation of 26 U.S.C. § 7203.

## II.  ASSESSING DEFENDANT'S SENTENCE

### A.  Statutorily Authorized Sentence

The statutorily authorized penalties for Mail Fraud and Wire Fraud charged in Counts 1 and 2 of the Information include: a term of imprisonment of not more than 20 years; a term of Supervised Release of not more than three years; a fine of not more than $250,000 or twice the pecuniary gain to defendant; and restitution.  *See* 18 U.S.C. §§ 1341, 1343, 3583(b), and 3663A; Presentence Investigation Report, ¶¶ 93, 96, 103 and 107.

The statutorily authorized penalties for each Failure to File Tax Return offense charged in Counts 3 through 6 include: a term of imprisonment of not more than 1 year; a term of

Supervised Release of not more than one year; and a fine of not more than $25,000.  *See* 26 U.S.C. § 7203; Presentence Investigation Report, ¶¶ 93, 96, and 103.

## B.   Sentencing Guidelines Calculations

The Court's Probation Office has calculated defendant's Offense Level under the United States Sentencing Guidelines as follows.

Group 1: Wire Fraud & Mail Fraud

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) |
| Specific Offense Characteristic: Loss > $150,000 | + 10 | USSG § 2B1.1(b)(1)(F) |
| Specific Offense Characteristic: Financial Hardship to Victim | + 2 | USSG § 2B1.1(b)(2)(A)(iii) |
| Specific Offense Characteristic: Violation of securities law by registered broker and investment adviser | + 4 | USSG § 2B1.1(b)(20)(A)(ii and iii) |
| Adjustment: Role | 0 | Upon defendant's objection, the Court's Probation Office has concluded that a role adjustment is not warranted in light of the foregoing Specific Offense Characteristics |
| Adjusted Offense Level: | 23 | |

Group 2: Failure to File Tax Returns

| | | |
|---|---|---|
| Base Offense Level: | 14 | USSG § 2T1.1(a)(1) |
| Specific Offense Characteristic: Income > $10,000 per year | + 2 | USSG § 2B1.1(b)(1)(F) |
| Adjustment: Role | 0 | |

6

| | | |
|---|---|---|
| Adjusted Offense Level: | 16 | |
| Combined Offense Adjustment: | +  1 | USSG § 3D1.4: |
| | | Group 1 = 1 unit |
| | | Group 2 = ½ unit[1] |
| | | 1 ½ unit |
| Combined Offense Level: | 24 | USSG § 3D1.4 |
| Adjustment: Acceptance of Responsibility | - 3 | Defendant timely accepted responsibility for his crime and pled guilty. Provided that defendant continues to accept responsibility, he should receive a cumulative downward adjustment of 3-Levels under USSG § 3E1.1. |
| Final Offense Level: | 21 | |

The Court's Probation Officer has determined that defendant falls within Criminal History Category I.

A Final Offense Level of 21 and Criminal History Category I yield an advisory imprisonment range under the Sentencing Guidelines of 37 to 46 months.  *See* Addendum to Presentence Investigation Report [Doc. 52], Response No. 1.

---

[1] In the original Presentence Investigation Report, the Probation Office assessed no adjustment for the Combined Offenses because—as originally calculated—Group 2's Adjusted Offense Level of 16 was 9 levels less serious than Group 1 with an Adjusted Offense Level of 25.   However, upon defendant's objection, the Probation Office has withdrawn any Role Adjustment for the Group 2 offenses, reducing the defendant's Adjusted Offense Level to 23. The difference between the Adjusted Offense Levels of Group 1 and Group 2 is now 7 Levels.   Section 3D1.4(b) instructs: "Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level."   With this adjustment, § 3D1.4 further instructs that 1 Level is to be added to the Group with the highest offense level.

## C. Factors to be Considered Pursuant to 18 U.S.C. § 3553(a)

Subsection 3553(a) identifies a litany of factors to be considered in imposing a sentence upon a defendant:

> The court, in determining the particular sentence to be imposed, shall consider—
>
> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed—
>
>   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B)  to afford adequate deterrence to criminal conduct;
>
>   (C)  to protect the public from further crimes of the defendant; and
>
>   (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)  the kinds of sentences available;
>
> (4)  the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
> (5)  any pertinent policy statement . . . issued by the Sentencing Commission . . . ;
>
> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

These factors will be examined in inverse order.

(7)   <u>The need to provide restitution</u>:

Although C.K. and earlier victims of defendant's Ponzi scheme were previously repaid, F.B. lost $47,481.35; V.C. lost $30,000; and L.J. lost $20,000.   In

8

aggregate, defendant owes these three victims of his scheme $97,481.35. Additionally, defendant has a tax debt to the United States of $82,627, plus interest and any applicable penalties.

Defendant's sentencing has previously been delayed affording him an opportunity to make pre-payments towards restitution. Defendant appears to have made a good faith effort to make such pre-payments. It appears that defendant made pre-payments authorized by the Court [Doc. 45] of at least $82,500. The Court's judgment and sentence should include an order of restitution to permit distribution of these funds to F.B., V.C., and L.J., and to require that defendant make further restitution to these victims if defendant does not pay the balance by the time of his sentencing.

Further, the government concurs with the Court's Probation Officer's recommendation that the conditions of defendant's Supervised Release should include the requirement that he pay restitution to the Internal Revenue Service in the sum of $82,627.

(6) <u>The need to avoid unwarranted sentencing disparities</u>:

The need to avoid disparate sentences for defendants who have been found guilty of similar conduct is a factor that weighs heavily in favor of a sentence comporting with the Sentencing Guidelines. This is, after all, a central purpose of the Sentencing Guidelines. *See Mistretta v. United States*, 488 U.S. 361, 363-366 (1989).

(4-5)  <u>The Sentencing Guidelines</u>:

Both (4) the sentencing range established for offenses of this kind as set forth in the Sentencing Guidelines and (5) the Sentencing Commission's policy statements weigh in favor of a sentence within the Guidelines' advisory imprisonment range.

(3)  <u>The kinds of sentences available</u>:

Counts 1 and 2 each carry an authorized term of imprisonment of up to 20 years, and Counts 3 through 6 each add a year to his potential statutory maximum sentence. None of his offenses of conviction have a mandatory minimum term of imprisonment. The Court thus has broad discretion in assessing an appropriate term of imprisonment.

(2)  <u>Just punishment to reflect seriousness of offense and to deter such crimes</u>:

In assessing an appropriate sentence, the Court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense and provide just punishment, (B) to afford adequate deterrence, (C) to protect the public from the defendant, and (D) to provide correctional treatment and rehabilitation. Although the news cycle and courts' dockets are dominated by crimes of violence and the devastation wrought by drug trafficking, the impact of white-collar crimes should not be disregarded. While defendant's crimes did not involve violence or any physical harm to his victims, financial crimes of this ilk are devastating to their targets. A substantial sentence is needed to reflect the seriousness of defendant's crimes.

Further, although often unreported and unpunished, financial frauds have reached epidemic proportions.

> Newly released Federal Trade Commission data shows that consumers reported losing nearly $8.8 billion to fraud in 2022, an increase of more than 30 percent over the previous year.
>
> Consumers reported losing more money to investment scams—more than $3.8 billion—than any other category in 2022. That amount more than doubles the amount reported lost in 2021. The second highest reported loss amount came from imposter scams, with losses of $2.6 billion reported, up from $2.4 billion in 2021.

Federal Trade Commission, New FTC Data Show Consumers Reported Losing Nearly $8.8 Billion to Scams in 2022 (February 23, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/new-ftc-data-show-consumers-reported-losing-nearly-88-billion-scams-2022#:~:text=Consumers%20reported%20losing%20more%20money,from%20%242.4%20billion%20in%202021.  A substantial sentence is needed to deter both defendant and others from engaging in this type of criminal activity.

(1) <u>The nature and circumstances of the offense and the history and characteristics of the defendant</u>:

While defendant suffered losses in his life, he also had advantages and opportunities unknown to many of the defendants who appear before this court. Defendant did not steal from his clients of necessity; defendant chose to defraud investors who had entrusted him with their retirement savings because it was an easy way to fund his desired lifestyle and personal expenditures. Now, he comes before this Court to be sentenced for his criminal choices.

Although this Court is not required to rigorously adhere to the requirements of the Sentencing Guidelines in weighing whether a variance is appropriate under 18 U.S.C. § 3553, *see United States v. Gantt*, 679 F.3d 1240, 1247 (10th Cir. 2012), in measuring the history and characteristics of the defendant pursuant to § 3553(a)(1) this Court need not close its eyes to the nature and scope of defendant's misconduct and the damage that he wrought.   In *United States v. Sample,* 901 F.3d 1196 (10th Cir. 2018), our Court of Appeals recognized that substantial sentences are needed in cases of white-collar crimes to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct" under 18 U.S.C. § 3553(a).

> As the district court noted, Sample's offense was serious and it inflicted considerable harm upon his victims. See § 3553(a)(2)(A) (requiring that district courts consider "the need for the sentence imposed" to "reflect the seriousness of the offense"). He misappropriated more than a million dollars. That seriousness alone weighs against the lenient nature of the sentence that the trial court imposed. *United States v. Walker*, 844 F.3d 1253, 1256 (10th Cir. 2017) ("[T]he length of the sentence should reflect the harm done and the gravity of the defendant's conduct." (quotations omitted) ).
>
> Similarly, the district court failed to adequately balance the need to "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct." § 3553(a)(2)(A), (B). "General deterrence is one of the key purposes of sentencing." *Walker*, 844 F.3d at 1257 (quotation omitted). Congress has recognized that general deterrence is particularly important in the context of white collar crime. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those

criminals might themselves be unlikely to commit another offense."); S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime."). White collar criminals may be particularly susceptible to general deterrence because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Kuhlman*, 711 F.3d at 1329 (quotation and alteration omitted).

In imposing minimal sentences on white-collar criminals, courts "raise concerns of sentencing disparities according to socio-economic" status. *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "minimiz[ing] discrepancies between white- and blue-collar offenses, and limit[ing] the ability of those with money or earning potential to buy their way out of jail").

*Sample*, 901 F.3d at 1200-1201 (reversing district court for imposing probation on defendant who misappropriated over a million dollars).

### III.  CONCLUSION

Although a substantial term of imprisonment is needed to reflect the seriousness of defendant's offense and to deter defendant and others from such criminal conduct, defendant has demonstrated uncommon remorse for his crime by making pre-payments towards the restitution due to the victims of his Ponzi scheme.    The UNITED STATES submits that the objectives outlined in § 3553(a) can be achieved while showing defendant leniency in light of his personal history and characteristics, including his exceptional albeit belated effort to make restitution to his victims.

THEREFORE, the UNITED STATES recommends that the Court sentence defendant to a term of 24 months of imprisonment (equivalent to a 4-Level downward variance) to be followed by a term of 3 years of Supervised Release to include the special condition that defendant make full restitution to the victims of his fraudulent scheme as well as for the income taxes owed to the United States.

RESPECTFULLY SUBMITTED this 4th day of December 2023.

Alexander M.M. Uballez
United States Attorney

_/s/_
Timothy S. Vasquez
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico   87103
(505) 346-7274

CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, I shall file the foregoing document electronically through the CM/ECF system.   Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.

_/s/_
Timothy S. Vasquez
Assistant United States Attorney